**NATIONWIDE MUTUAL INSURANCE COMPANY**

v.

John T. SIMMS, Eugene Vaughn, James R. Jones, Joshua R. Jones, Howard Steward, Theresa Robinson, Carroll Montgomery, Bert Robinson and Eliza Robinson, individually, and Bert Robinson, as Administrator of the Estate of Shirley Robinson.

**Civ. A. No. 14610.**

United States District Court
D. Maryland.
July 16, 1964.

788

Herbert F. Murray and Robert E. Powell, Smith, Somerville & Case, Baltimore, Md., for plaintiff.

Hyman C. Ullman, Milton I. Vogelhut, Hyman B. Rubenstein, Baltimore, Md., for defendants.

R. DORSEY WATKINS, District Judge.

This is a suit brought by the plaintiff insurance company, a corporation incorporated under the laws of the State of Ohio and having its principal place of business in the State of Ohio, for a declaratory judgment against John T. Simms, the owner of a bus involved in a collision; Eugene Vaughn, the operator of said bus; and the remaining defendants, parties injured in or through the collision. All of the defendants are citizens of the State of Maryland. As the amount in controversy exceeds, exclusive of interest and costs, the sum of $10,000, the jurisdiction of this court is allegedly based upon diversity of citizenship.

The complaint alleges that all of the injured parties have made claims arising out of personal injuries or property damage suffered as a result of the collision. Certainly all of the injured parties are potential parties plaintiff in litigation against both Simms and Vaughn. Indeed prior to this complaint for declaratory relief having been filed, Bert Robinson and Eliza Robinson, as surviving parents of Shirley Robinson, a minor, deceased, and Bert Robinson, as administrator of the estate of Shirley Robinson, a minor, deceased, and Bert Robinson in his own right, instituted suit in the Superior Court of Baltimore City against the defendants, Simms and Vaughn. Since the institution of the instant declaratory judgment suit Joshua Jones, James Jones, and Howard Steward have each instituted a separate suit in the Superior Court of Baltimore City against Simms and Vaughn.

On the date of the accident there was in full force and effect an automobile liability policy which had been issued to the defendant Simms by the plaintiff insurance carrier. The terms of the policy provided coverage for a Chevrolet bus owned by Simms up to the limits of $10,000 for each injury to one person and $300,000 for each accident, for all sums which those entitled to protection should become legally obligated to pay as damages arising out of the ownership, maintenance or use of the Chevrolet bus because of personal injuries or property damages. The protection afforded by the policy extended to the named insured and under the usual "omnibus clause" to any other person responsible for the use of the bus provided the actual use was with the permission of the named insured. In addition, the policy contained "conditions" among which were the giving of written notice by or on behalf of the insured to the company of any accident or occurrence as soon as practicable; in the event of a claim having been made or suit having been brought against the insured, the immediate forwarding to the company of every demand, notice, summons or other process received by insured; and

the assistance and cooperation of the insured in connection with any claim or suit.

The purpose of and the relief prayed for in this suit is a declaration (1) that the plaintiff insured is under no duty or obligation to appear and defend any presently pending, or future, claims or suits of any of the injured defendants against defendant Vaughn or to assume any liability for the acts of the said Vaughn because at the time and place of the accident he was not operating the Chevrolet bus with the permission of the named insured; and (2) that the plaintiff insurer is under no duty or obligation to appear and defend any presently pending, or future, claims or suits of the injured defendants against defendant Simms or to afford him any protection under his policy because Simms failed and refused to deliver to the plaintiff all papers in connection with the claims or suits arising out of the collision herein involved and failed and refused to cooperate and assist the plaintiff in connection with claims or suits pending against him as required by the terms of his liability insurance policy. In addition, a temporary restraining order or a temporary injunction or both are sought against the injured defendants to enjoin the prosecution of presently pending and future suits against Simms and Vaughn for damages for personal injuries or property damage arising out of the accident.

The first question before the court is whether or not the court has jurisdiction over this suit, and if so, whether or not the court should exercise its discretion in favor of entertaining jurisdiction.

■ Diversity of citizenship and the requisite amount in controversy exist between plaintiff and defendant Simms. A typical case for declaratory relief is presented, the plaintiff insurer contending that its duty to defend and its duty to indemnify are both absolved by its insured's breach of various cooperation clauses in the policy. As was said in Aetna Casualty & Surety Company v. Yeatts, 4 Cir. 1938, 99 F.2d 665, 669:

" * * * The immediate question which the surety must decide is whether it is obliged to defend the suit against the insured in the state court. Obviously its decision cannot await the determination of that suit, nor need the determination of its duty in this respect interfere with the trial of the state suit. An actual controversy as to its contractual duty has arisen between it and the holder of its policy, and hence such a situation exists as is contemplated by the terms of the statute [authorizing declaratory relief]. Moreover, a question of coverage is involved, for the duty to defend and the duty to indemnify are both absolved by criminal conduct on the part of the insured, and this question may not be conclusively decided in the state suit to which the company is not a party, even though it undertakes the defense. * * * In similar situations it has been held in a number of recent cases that the insurer is entitled to be advised by the court whether or not it is obligated to defend and indemnify the insured against claims upon which suits are threatened or have already been brought."

None of the defendants contends that as between plaintiff insurer and Simms, its named insured, an appropriate case for retaining jurisdiction for the granting or refusal of declaratory relief does not exist.

■■ However, the injured defendants urge that the controversy between the plaintiff insurer on one side and the defendant Vaughn and themselves on the other side, raising the issue of whether or not at the time and place of the accident Vaughn was operating the bus with the permission of the named insured so as to come within the coverage of the policy issued to Simms, under the "omnibus clause" definition of an insured, that is the issue of "permissive use", raises

the same issue, which has already been presented for consideration in the pending state court proceedings and thus, following the rationale of such cases as Aetna Casualty & Surety Company v. Quarles, 4 Cir. 1938, 92 F.2d 321; Maryland Casualty Insurance v. Boyle Construction Company, 4 Cir. 1941, 123 F.2d 558; American Fidelity & Casualty Company v. Service Oil Company, 4 Cir. 1947, 164 F.2d 478, this court should decline to take jurisdiction over the controversy between the plaintiff insurer and the injured defendants and defendant Vaughn. The cases relied upon by the injured defendants clearly stand for the proposition that the discretion to grant or refuse declaratory relief is one that "should not be exercised for the purpose of trying issues involved in cases already pending, especially where they can be tried with equal facility in such cases, or for the purpose of anticipating the trial of an issue in a court of co-ordinate jurisdiction." (Aetna Casualty & Surety Company v. Quarles, 4 Cir. 1937, 92 F.2d 321, 324).

The complete answer to the injured defendants' contention is that the issue of permissive use presented in this court is entirely different from the issue of agency presented in the pending suits in the state court; different parties are involved; different parties carry the burden of proof and different elements of proof are required to prevail. The United States Court of Appeals for the Fourth Circuit had occasion in a similar case to analyze and compare the issues raised in the District Court and in the state court in American Automobile Insurance Company v. Fulcher, 4 Cir. 1953, 201 F.2d 751. In that case a suit in the state court against the owner of the car in question, also the named insured, and against the driver to recover damages for wrongful death resulted in a verdict in favor of the plaintiff against the driver of the car only, the court having sustained a motion at the conclusion of the plaintiff's evidence to strike the evidence as to the owner of the car, the named insured. Thereafter, the plaintiff administrator initiated an action in the Federal District Court to recover the judgment rendered in the state court against the driver on the theory that he was an additional insured under the terms of the automobile liability policy issued to the owner, the named insured. The defendant insurance company entered a plea of res adjudicata. The District Judge held that the judgment of the state court in favor of the owner and named insured was not res adjudicata of the issue before the District Court and found that at the time of the accident the driver was operating the car with the implied permission of the owner, the named insured. On appeal the Fourth Circuit affirmed saying:

"The instant action, unlike that in the State Court, is not one which seeks to establish the vicarious personal liability of a principal upon a theory of common law agency. The case at bar is a simple action on a contract, and to recover against the defendant insurance company, it is not incumbent upon the plaintiff to prove an affirmative consent on the part of Fred Green [owner] to the use of his car, or that the car was being used on his business. The only issue before the District Court was whether or not at the time of the accident, George Green was driving Fred Green's car with his permission, express or implied, within the terms of the contract and the meaning of the applicable Virginia statutes.

\* \* \* \* \* \*

"It is clear that the issues in the two actions here in question are not identical. The evidence available to the plaintiff in the State Court was insufficient to show the high degree of relationship between owner and driver amounting to agency. In the District Court agency was not an issue, and the burden of proof on the plaintiff to show permission, express or implied, which was the only essential to a recovery under the contract of insurance, was considerably

reduced. Consequently, the very same evidence which proved inadequate to establish the personal liability of Fred Green [owner] in the State Court, might well prove sufficient to fix liability upon the defendant insurance company in the District Court.

\* \* \* \* \* \*

"\* \* \* Plaintiff here does not seek to trace the liability of the insurance company through any antecedent liability of Fred Green [owner]. Rather it is the plaintiff's position that, pursuant to the Virginia law and the terms of the insurance policy issued to Fred Green, if George Green was driving Fred Green's car with his permission at the time of the accident, then George Green is an additional insured under the policy and no exoneration of Fred Green bears on the issue. Indeed, as plaintiff concedes, the State Court judgment in favor of Fred Green may be considered *res adjudicata* as to his personal liability in this matter; yet it is in no sense *res adjudicata* as to the liability of the defendant insurance company in this forum." (American Automobile Insurance Company v. Fulcher, 4 Cir. 1953, 201 F.2d 751, 754, 755).

Clearly a judgment in the state court in favor of Simms on the issue of agency would in no way decide the issue of permissive use presented to this court. Nor would a determination by the trier of fact in any of the presently pending four tort suits in the state court against Simms to the effect that Vaughn was operating the automobile as the agent of Simms within the scope of his agency be dispositive of the permissive use issue now before this court even if one accepts the general rule that a "person operating an automobile as the agent of the owner within the scope of his agency *must necessarily* be operating with permission of the owner." (7 Appleman Insurance Law and Practice, Named and Additional Insureds, section 4365, page 305, emphasis supplied; Skut v. Hart-

ford Accident & Indemnity Company, 1955, 142 Conn. 388, 114 A.2d 681). The insurance company would not be bound by any such finding as it is not a party to the suits in the state court even though it might hereafter undertake their defense. (Aetna Casualty & Surety Company v. Yeatts, 4 Cir. 1938, 99 F.2d 665, 669; American Casualty Company of Reading, Pennsylvania v. Howard, 4 Cir. 1949, 173 F.2d 924, 929). The Howard case distinguishes the Quarles case and the Boyle Construction Company case, relied upon by injured defendants, as follows:

"Casualty [insurer] is not, and cannot be, a party to the action instituted by the Administrator [claimant] against Elias Howard [insured] under the Survival Statute. And nowhere in the State Court is there pending any litigation involving the duty of Casualty to defend that action and to pay any judgment that might be recovered therein. Cf. Indemnity Ins. Co. [of North America] v. Schriefer, 4 Cir., 142 F.2d 851; Aetna Casualty & Surety Co. v. Quarles, 4 Cir., 92 F.2d 321; Maryland Casualty Co. v. Boyle Construction Co., 4 Cir., 123 F.2d 558. So there are issues involved in that connection which can *(and should)* be settled in the instant action for a declaratory judgment." (American Casualty Co. of Reading, Pennsylvania v. Howard, 4 Cir., 1949, 173 F.2d 924, 929; emphasis supplied).

The instant case would appear to come squarely within the above quoted language. For a decision directly on point reference should be had to Northwest Casualty Company v. Kirkman, N.D.N.C. 1954, 119 F.Supp. 828 where the court exercised its discretion in favor of granting a declaratory judgment as to the issue of permissive use and found permission to be lacking. This court concludes on the basis of the above authorities that the instant case is a proper one in which to exercise its discretion to grant declaratory relief.

■ Injured defendants attempt to challenge the jurisdiction of this court on the basis that if the court were to hold that the policy issued by the plaintiff insurer to Simms, its named insured, is not void, there would be then no controversy between the plaintiff and defendant Simms. The injured defendants urge that the court would consequently be required to realign the parties in accordance with their then respective interests, Simms being realigned on the plaintiff's side of the docket and thereby defeating jurisdiction between Simms, a Maryland citizen, and defendant Vaughn and the injured defendants, all citizens of the State of Maryland. It is true that were there no valid controversy between plaintiff and Simms as to coverage of Simms under the policy he should normally be realigned on the side of the plaintiff, thus destroying diversity. (Northwest Casualty Co. v. Kirkman, M. D.N.C.1954, 119 F.Supp. 828). However, there is at the present time a valid controversy between plaintiff and Simms. It is a basic and well established principle that jurisdiction must exist at the time of the filing of the complaint and is not defeated by subsequent changes in the citizenship of a party. (St. Paul Mercury Indemnity Company v. Red Cab Company, 1938, 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed. 845). By analogy if a controversy presently exists between plaintiff and its named insured sufficient to support diversity jurisdiction, it would not seem logical that a conjectural but possible future ruling in favor of Simms would require a realignment and dismissal of the entire case for lack of jurisdiction. Suffice it to say, as of the present time, jurisdiction exists. Should injured defendants at some time in the future file a motion to realign and dismiss for lack of diversity of citizenship, the court will consider such a motion at such a time. Moreover, as the named insured is not an indispensible party to the determination of whether or not Vaughn is covered as an additional insured (Northwest Casualty Co. v. Kirkman, M.D.N.C.1954, 119 F.Supp. 828) it

should never become necessary to dismiss the entire case for lack of jurisdiction, merely dropping Simms as a further party to any remaining controversy apparently being sufficient to cure any otherwise jurisdictional defect.

The court having jurisdiction of this case will exercise its discretion in favor of granting declaratory relief as to the issues involved, including the issue of permissive use.

■ None of the parties contends that Vaughn had express permission to drive the bus at the time of the accident; rather, implied permission is relied upon. "It is settled law that the question of implied permission is one of fact, to be resolved by the jury or the court sitting as the trier of fact." (American Auto. Insurance Company v. Fulcher, 4 Cir. 1953, 201 F.2d 751, 756).

The court makes the following findings of fact. In the latter part of 1961 Simms hired Vaughn as a helper in Simms' business, that of home improvement. In the early part of 1962 Simms decided to branch out and acquired the twenty-eight passenger Chevrolet bus which later was to be involved in the accident in question. He purchased it originally to transport from their own church to other churches where they were to perform, church members, both adults and children, who had formed a singing group. This enterprise was not highly successful and by the end of August 1962 had dwindled for all practical purposes to a nonexistent operation. In September Simms conceived the idea of undertaking to transport handicapped children to the public schools which themselves provided no such transportation. An interested foundation in effect paid Simms for the transportation costs by supplementing the income of those parents who were unable to pay. The school children transportation began in September of 1962 and lasted until the time of the accident in November of 1962. In addition to using the 1952 Chevrolet school bus Simms owned and transported the children in a 1954 Mercury station wagon and upon occasions in a second station

wagon not further described. Simms himself either drove the bus or the second station wagon. Beginning in September he employed Vaughn to drive the 1954 Mercury station wagon and in October he hired one Frederick Johnson to drive the school bus. The evidence offered as to these facts by the parties was in no way contradictory. Johnson stated:[1]

"* * * During the time that I was employed by John Simms hauling school children, as far as I know, no one ever drove the bus except either myself or John Simms. I do know a Eugene Vaughn and as far as I know Vaughn was employed by Simms, as a station wagon driver. During the period that Simms employed me, Vaughn never drove the Bus, and couldn't drive the bus, according to his own feelings. I tried to find out why and Vaughn said to me that he couldn't drive it. Vaughn worked for Simms before I did and still got me to drive the bus."

Vaughn himself testified:[2]

"Q. And how often during a period of a week would you drive these children to and from school?

"A. Five days a week.

"Q. Would you drive them in the morning and then take them back in the afternoon?

"A. Yes.

"Q. Now, what vehicle would you use?

"A. I was using the station wagon."

*     *     *     *     *     *

"Q. Would anybody other than yourself and Mr. Simms operate the station wagons and the bus to take children to and from school?

"A. Fred Johnson at sometimes.

"Q. And who was Fred Johnson?

"A. He was a fellow that was working with Simms driving a bus."

During the period of time that Vaughn was driving the Mercury station wagon he had unlimited use of it for his own personal purposes. He had a set of keys to the vehicle as did Simms. It is significant, however, that Vaughn at no time either in his statements given to the Accident Investigation Division of the Police Department of Baltimore City or during his testimony at the trial of this case claimed ever to have been given permission to use or actually to have used the bus for personal purposes prior to the day of the accident. It is logical that Simms would not have turned over to a part-time employee for his personal use a large, lumbersome, twenty-eight passenger bus, particularly when the employee already had the unlimited use of another vehicle and when apparently he either could not operate or was dubious about his ability to operate the bus.

Approximately ten days before the accident occurred the bus was put in an auto shop for repairs. During this time the school children transportation was conducted through the use of the two station wagons. The bus was ready to be put back into service by Friday, November 9, 1962. It is at this point that the testimony of Vaughn and Simms becomes diametrically opposed. Simms during his testimony at the trial of this case categorically stated that Vaughn had never, to his knowledge or with his approval, driven the Chevrolet school bus. He made similar representations in two signed statements given to the plaintiff insurer during its investigation of the accident. Vaughn, on the other hand, contends that on the Friday in question he went to the 1500 block of Lanvale Street where Simms was working and asked Simms whether or not he was going to help in picking up the children that evening. Simms said "no" and Vaughn informed him that he would have to use the bus as he had too many children to be able to transport them all in one trip in the station wagon. In

---

1. Signed statement of Frederick P. Johnson, plaintiff's exhibit 20.

2. Transcript of testimony of Vaughn, pages 3, 8–9.

choosing between this conflicting testimony the court has accepted the testimony of Vaughn, that being least favorable to the plaintiff insurer. The conversation between Simms and Vaughn in the latter's own words was as follows:[3]

"* * * I told him that I would have to use the bus. He said okay; do you think you can handle it? I said yes, there is no problem.

"Q. Did you see Mr. Simms about 5 o'clock in the evening on Friday, November 9, 1962, after you returned the children to their homes?

* * * * * *

"A. I was at 1802 Riggs Avenue, where most of the time I would be after finishing my run. So, he came to me and told me, said, well, I don't see any scratches or nothing; you got it back in one piece.

"So, we sit there and talk for awhile, and he got ready to go, and I asked him if he had any transportation; he said yes, outside in front, and he left."

The clear import of this testimony by Vaughn is that prior to Friday, November 9, 1962, he had never before driven the bus. Otherwise, there would have been no reason for Simms to have asked Vaughn "do you think you can handle it?" Nor would there have been any reason for Simms' comment after the evening transportation was over "well, I don't see any scratches or nothing; you got it back in one piece." The conclusion that this was the first time that Vaughn had ever driven the bus is further supported by Johnson's statement quoted above and a statement given by Vaughn's former landlady who said in part:[4]

"* * * In the past, Mr. Vaughn had told me that he couldn't drive the bus because he didn't understand the brakes. It came up because I knew that Simms had another driver who drove the bus and I couldn't understand why the kids couldn't all be hauled in the bus, thus eliminating a driver. Simms, had also explained to me that Vaughn couldn't drive the bus and was not allowed to use the bus at any time."

And in concluding his testimony Vaughn was asked:[5]

"Q. And were there any other occasions than on Friday, November 9th, that you specifically asked Mr. Simms if you could use the bus?

"A. No, I never asked him to use the bus; I had no need to use the bus.

"Q. And that was the only time that you ever went to him to ask if you could use the bus?

"A. Why, I didn't ask him; I told him I was going to use the bus; I would have to use the bus that evening because he was not able to pick the children up with the bus."

After the homeward bound transportation of the school children on Friday the bus was parked on the street in a neighborhood which was not far from where Vaughn lived. The bus was customarily parked in this vicinity, the place being but a short distance (about a half a block) from where Johnson, the bus driver, lived. As the bus was kept on the street it was moved by Simms and/or Johnson several times a day to avoid receiving tickets for parking violations. There was only one set of keys to the bus and to facilitate either Simms' or Johnson's being able, interchangeably, to move the bus, the keys were kept in the vehicle hidden behind the windshield wiper motor. Although the side door of the bus was locked, entry was possible at all times through the back door of the vehicle which could not be locked. Vaughn knew the approximate vicinity in which the bus would be parked, knew

3. Transcript of testimony of Vaughn, pages 4–5.

4. Signed statement of Bernice Moore Lindsay, plaintiff's exhibit No. 7.

5. Transcript of testimony of Vaughn, page 66.

where the keys were left, and knew how to get into the bus.

On Saturday morning, November 10, 1962, Vaughn went to pick up the Mercury station wagon for his personal use. He found the station wagon with three slashed tires. It was then that he decided to take the bus. He testified that his purpose was to go to see a friend to get some money to have the tires on the station wagon repaired. The court does not accept this as a true statement as Vaughn's subsequent itinerary shows no such intent. Vaughn left his lodgings on north Fulton Avenue and drove to west Lexington Street to see a friend for "financial reasons." Not finding the friend at home he returned to his rooming house. At this time it was around 12 noon or 1 o'clock in the afternoon. About 5 o'clock that evening, he started out again in the school bus. He at that time had invited three friends to accompany him for a ride. His recollections of the evening's activities are understandably somewhat confused as there is every evidence that considerable drinking was taking place during the times here involved. Apparently he and his friends headed first for the 2400 block of west Lexington Street. Not finding the person that they were seeking at home, they returned to their original starting place. From there they proceeded in the bus to North Avenue. Vaughn was having trouble keeping the engine of the bus running. When it again stopped on North Avenue he proceeded to a friend's house to get a "hot shot." His companions, tiring of the numerous interruptions to their journey, at this point deserted Vaughn and individually made their way home. Vaughn finally succeeded in getting the bus running and started on his way. In the 2600 block of Lafayette Avenue the fatal accident herein involved occurred at approximately 9:50 p. m. Vaughn ran from the scene of the accident, returned home and called the police, notifying them that Simms' Chevrolet bus had been stolen. This fictitious story of the theft of the bus was repeated in the first statement that Vaughn gave to the Accident Investigation Division of the Baltimore City Police Department, and was repudiated in the second statement which he gave to the police. Simms first learned of the accident on Sunday, November 11, 1962 when the police contacted him to advise that his bus had been involved in a fatal accident. Subsequently, Simms charged Vaughn with unauthorized use of his bus.

It is against this factual background that the question of implied permission must be determined. The United States Court of Appeals for the Fourth Circuit has summarized its approach in this field as follows:

> "Our own decisions, we think, show a strong tendency toward a liberal interpretation, in favor of the insured, of the 'omnibus clause.' This clause should not be construed and applied, from a purely analytical viewpoint, under a literal interpretation of the words of the policy. The spirit, not the letter, should control. Statutes requiring the insertion of the 'omnibus clause' in automobile liability policies reflect a clear cut policy to protect the public. They should be construed and applied so as to carry out this policy." (Chatfield v. Farm Bureau Mutual Auto. Insurance Co., 4 Cir. 1953, 208 F.2d 250, 256).

However, even a liberal construction of an insurance policy's provisions will not justify a disregard of its plain terms or permit "legislation", or the rewriting of the policy, by the court. Again the United States Court of Appeals for the Fourth Circuit has stated the problem succinctly:

> "We are not unmindful of the weighty considerations which indicate the desirability, from a public standpoint, of requiring insurance coverage broad enough to protect all who suffer injury from any use of an insured automobile, except perhaps by a thief, or even then. Such all-inclusive coverage, however, can-

not be judicially imposed against the plain and legally unforbidden restrictions contained in an insurance policy. The command for universal coverage, if such it is to be, must come from the legislature." (Farmer v. Fidelity & Casualty Company of New York, 4 Cir. 1957, 249 F.2d 185, 189).

There is not one single fact to evidence an *implied* permission to use the school bus, much less to use it on the day in question in the manner in which it was used for personal purposes. Indeed, all the factors in the case evidence lack of implied permission. There is the one use on one occasion for a specific purpose, the carrying out of Simms' business undertakings, after a definite request for permission so to use the bus and after *express* and *limited* permission had been granted.[6] Implied permission on the contrary arises out of the usage or practice of the parties over a sufficient period of time prior to the day on which the questioned implied permissive use occurred. "The requirements for such an implied permission were well stated in Hinton v. Indemnity Ins. Co. (1940) 175 Va. 205, 8 S.E.2d 279, where the court, after discussing the meaning of the term 'express consent,' said: 'On the other hand, the correlative word "implied," as defined in Webster's New International Dictionary, 2d ed., means "inferential or tacitly conceded." It involves an inference arising from a course of conduct or relationship between the parties, in which there is mutual acquiescence or lack of objection under circumstances signifying assent.'" (Annotation—Automobile Liability Insurance: Permission or Consent to Employee's Use of Car within Meaning of Omnibus Coverage Clause, 5 A.L.R.2d 600, 610). Similarly,

it was said in Tomasetti v. Maryland Casualty Company, 1933, 117 Conn. 505, 169 A. 54, 55, implied permission "may arise, and be implied, from a course of conduct pursued, with knowledge of the facts, for such time and in such manner as to signify, and be compatible only with, an understanding consent amounting to a grant of the privilege involved."

The entire course of conduct between Simms and Vaughn as to the operation of the school bus negates the existence of any implied permissive use. If three tires had not been slashed on the Mercury station wagon, the bus would never have been used. Nothing in the relationship between Simms and Vaughn indicated the probability or possibility of such a use. It should be noted at this point that there is a clear and significant distinction between the problem of initial permission and subsequent deviation. In the instant case this court is solely concerned with initial permission. Having found that the facts do not support a finding of initial implied permission the court need go no further. By way of contrast and illustration had the accident in question occurred on the Friday before the accident when Vaughn was operating the vehicle with the initial express permission of Simms and had Vaughn been engaged in a frolic of his own, then the question before the court, rather than initial permission, would have been the scope of permission granted and the extent of deviation from the permitted use. When dealing with the problem of deviation the courts have found themselves divided into three groups; those adopting the position that if the vehicle was entrusted to the driver by the named insured, then any operation is considered to be within the scope of the permission granted regardless of

---

6. Often a situation will arise where a use is not only limited but further use is expressly denied. In view of the fact that Vaughn had the use of the Mercury station wagon for his own personal business, in view of the fact that a twenty-eight passenger school bus was not a suitable vehicle for the personal use of one individual and in view of the fact that

Vaughn himself questioned his ability to operate the bus, a not unfounded doubt considering the fatal accident resulting from Vaughn's operation of the vehicle, Simms had no reason to anticipate the personal use made by Vaughn of the bus on Saturday, November 10, and hence no duty or reason to have expressly forbidden such use.

how grossly the terms of the original bailment may have been violated, the so-called "hell or high water" rule; those probably in the majority holding that where the use made of the automobile sufficiently exceeds the scope of the permission given so as to make the bailee liable to the insured in an action for conversion the use is not within the scope of the permission given, the so-called "conversion" rule; and thirdly, those holding that a minor, rather than a gross, violation of the terms of the bailment, although a deviation, still affords protection to the bailee as an additional insured, the so-called "minor deviation" rule. (For comprehensive discussion of these three rules see: 7 Appleman, Insurance Law and Practice, sections 4366, 4367, 4368, pages 308–327; Annotation —Automobile Insurance—Coverage, 5 A. L.R.2d 600, 621–643).

■ But this court need not consider which rule the Court of Appeals of Maryland has applied or would apply if called upon to do so as the problem in this case is not one of deviation. "Deviation from permitted use must be distinguished from use after termination of the permission. The latter use has been held in all the cases dealing with the situation to be without the employer's permission. * * * Closely connected with though clearly distinguishable from, * * * [deviation] is the case where the employee obtains permission from the employer for a specific use of the automobile and returns it after such use but thereafter regains possession of it and uses it without having obtained a new or further permission from his employer. The question there is whether the initial permission extends to such use or whether the permission ends with the return of the automobile. The answer to this question is that where an employee is given custody of the automobile to accomplish a certain purpose, and he puts the car away after completion of such purpose, a subsequent retaking and additional use of the automobile by such employee is generally deemed a new use for

which a new consent must be given, and in the absence of a new permission, the employee is not covered as an additional insured under the omnibus clause of the indemnity policy. In other words, the mere fact that the employee had rightful custody of the automobile for specific purposes does not give him the right to use the car for purposes not contemplated by employer after the original bailment has been ended." (Annotation—Automobile Insurance—Coverage, 5 A.L.R.2d 600, 626, 660–661).

In the instant case the original express, and limited, permission having ended, no implied permission having ever existed, and no subsequent permission, either express or implied, having been granted, Vaughn was not, within the terms of the omnibus clause of the policy in suit, one using the bus "with the permission of the named insured." Accordingly, the plaintiff insurer is entitled to a declaration that it is under no duty or obligation to appear or defend any presently pending, or future, claims or suits of any of the injured defendants against defendant Vaughn or to assume any liability for the acts of the said Vaughn.

It follows that if Vaughn was not even operating the vehicle in question with the permission of Simms that Simms cannot be held liable in the state courts to the injured defendants upon a theory of common law agency where both permissive use and use within the scope of Vaughn's employment must be affirmatively shown. As the injured defendants may not proceed against Simms in the state courts as a result of this court's ruling on the question of permissive use, that portion of this case seeking a declaration that the plaintiff insurer is under no duty or obligation to appear or defend any presently pending, or future, claims or suits of the injured defendants against defendant Simms or to afford him any protection under his policy because of his alleged breach of various cooperation clauses in the policy has become moot, no further declaratory relief being

required.[7] Nor is there now any basis or need for the requested temporary restraining order or temporary injunction.

The foregoing embodies the court's findings of facts and conclusions of law, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

An appropriate order will be signed upon submission to the court within ten days.

7. This statement is based on the assumption that as a result of this opinion Simms will be promptly dropped as a party defendant in the pending state court cases.