**ALLSTATE INSURANCE COMPANY,**
**Plaintiff-Respondent,**

**v.**

**HARTFORD ACCIDENT AND INDEMNI-**
**TY COMPANY, Defendant-Appellant.**

**No. 9207.**

Missouri Court of Appeals,
Springfield District.

Sept. 27, 1972.

Rehearing Denied Oct. 12, 1972.

Manuel Drumm, Sikeston, for defendant-appellant.

Jackson, Thomasson, Dickerson & Gilbert, Paul V. Gilbert, Cape Girardeau, for plaintiff-respondent.

STONE, Judge.

The purpose of this declaratory judgment action is to determine which of the two parties litigant, i. e., plaintiff Allstate Insurance Company or defendant Hartford Accident and Indemnity Company, is the primary insurer of Gordon Humphrey with respect to the claims and litigation resulting from a major three-vehicle accident on U.S. Highway 61 near New Madrid, Missouri, "after dark" on the evening of Saturday, September 6, 1969. From the judgment and decree of the circuit court casting defendant Hartford in the role of primary insurer, it appeals.

One of the vehicles involved in the aforesaid crash was a 1966 Oldsmobile owned by Mrs. Myrtle Camp, a widow, and then being driven or operated by Humphrey, in which Mrs. Camp's daughter, Mrs. Molly Bea Girvin, 21 years 8 months of age, was riding. Humphrey, then 20 years 3 months of age, was an insured under an *Allstate policy* issued to his parents as the named insureds and the owners of three described automobiles, none of which was involved in the aforesaid crash. The *Allstate policy* contained the typical provision that "the insurance with respect to . . . a non-owned automobile shall be excess insurance over any other collectible insurance." At the time of accident, there also was in force and effect a *Hartford policy* issued to Mrs. Camp as the named insured and the owner of the 1966 Oldsmobile involved in the above-mentioned accident, which provided coverage under the so-called omnibus clause to "the named insured and any resident of the same household" and also to "any other person using such automobile with the permission of the named insured, *provided his actual operation* or (if he is not operating) his other

actual use *thereof is within the scope of such permission.*" (All emphasis herein is ours.)

The meritorious and determinative issue here is whether or not Humphrey was, as a *second permittee, operating* the Camp automobile with the *implied* permission of Mrs. Camp, the named insured in the Hartford policy, there being no contention that he was operating with her *express* permission. Since resolution of this issue requires a factual determination [Wells v. Hartford Acc. & Indem. Co., Mo. (banc), 459 S.W.2d 253, 258(4); St. Paul Insurance Co. v. Carlyle, Mo.App., 428 S.W.2d 753, 755(1)], we turn to the evidence, noting preliminarily that the case was tried and submitted in the circuit court on the depositions of Mrs. Camp, her daughter Molly, and Humphrey, all taken on July 21, 1970, and three Allstate exhibits, namely, the Allstate policy, the Hartford policy, and a "5¾0th page report" (handwritten statement) taken by an Allstate representative on December 1, 1969, almost three months after the accident of September 6, 1969. Because of the importance of the facts in this category of cases, at the risk of painful tedium we undertake a detailed evidentiary review in which we endeavor, with numerous testimonial references and excerpts, to preserve the flavor as well as the essence of the record brought to us.

Molly had been a resident student at Southeast Missouri State College in Cape Girardeau for "a year and a half" prior to the close of the 1969 summer term about August 1. Her marriage in 1969 had been of brief duration since she "left [her] husband the latter part of July 1969—he moved out to Sikeston." Sometime thereafter—"a couple of weeks" prior to September 6, 1969, so Molly thought, or "about a week or so" opined her mother—Molly went to Mrs. Camp's home in Lilbourn to be with her and assist her before and after "eardrum surgery in Memphis." But, as recorded in Molly's statement, "I didn't give up my apartment [in Cape Girardeau] as I only intended to stay with mother till

the fall term started." While with her mother during this and other periods, Molly had driven Mrs. Camp's 1966 Oldsmobile "if she needed it . . . and it was available"; but "she usually asked, made sure that nobody was going to use it . . . ." When Allstate's counsel inquired whether "any restrictions [were] put on her [Molly's] use of the car or could she . . . use it just about as she pleased based upon her good judgment," *Mrs. Camp* responded "I wouldn't phrase it like that; I would say if she had to go somewhere and it was agreeable she used the car." However, "at the moment" of inquiry Mrs. Camp did not remember "any expressed restrictions" on Molly's use of the automobile, although she added "I might remember something later" and also observed "I think every parent does at a certain time" restrict his or her children. Mrs. Camp regarded Molly as "pretty reliable," depended on her good judgment, and had no recollection of having told Molly not to permit "a particular person or group of persons" to drive the automobile. When *Molly* was asked "did your mother ever place any restrictions on you so far as the use of the car was concerned," her reply was: "I can't say exactly that she never did. I don't recall. That is all I can say on that." In her signed statement of December 1, 1969, to Allstate's representative, Molly said: "I always asked [mother] when I wanted to use the car, and would tell her where I was going. There was always a specific reason for taking it and if I drove it more than I intended or less then [sic] I intended, I would always tell her . . . . Mother & I had never talked about letting anyone else drive her car—it just never came up."

Mrs. Camp knew that sometimes Molly had "other young people" in the automobile with her and that on one occasion prior to September 6, 1969, Humphrey "was in the car"; but, as we proceed to point out, on the transcript before us the mother may not reasonably be charged with either actual or constructive knowledge that Molly had permitted any other person to drive the automobile. In her "5½0th page report" taken by an Allstate representative on *December 1, 1969,* Molly first stated on page 2 that *"I can't remember that anyone else drove mothers* [sic] *car, until I let Gordon Humphrey drive it on Sept. 6, 1969* [the date of accident]," but near the close of the "report" declared *"I do now recall one other occasion when Gordon drove my mother's car.* We had been at a friends [sic] house—25 or 30 of us—and after we left there, Gordon drove the car around New Madrid a little bit & I was with him & *no one else in the car.*[1] . . . *I did tell my mother he had driven the car* and I don't recall that she said anything at all about him driving the car." In her subsequent depositional testimony on *July 21, 1970,* Molly professed recollection of *two* occasions prior to September 6, 1969, when another had driven her mother's automobile, to wit, (1) on a shopping trip to Memphis "a girl friend . . . drove back," and (2) about one week prior to September 6, 1969, Humphrey had driven the automobile "most of the time" as he, Molly *and her friend, Sue Dowd,* rode some forty-five minutes to an hour within the city limits of New Madrid, a neighboring town in which both Humphrey and Sue resided. As to whether or not she had informed her mother that "a girl friend" had driven on the shopping trip to Memphis, Molly was "not sure"—"generally I tell her the course of events when I am in her car." And, to the direct inquiry whether her mother knew "that you had Gordon Humphrey in the car with you *or* that he

---

[1]. Undertaking later depositional explanation of this admittedly false statement that there was "no one else in the car," Molly's testimony on direct examination by Allstate's counsel was that "[t]he reason that I would say that no one else was in the car was that I believe Sue [Dowd] had been having some trouble at the time. I just left her out of it since she is a friend of mine. I didn't think it would be important." At another point, Molly stated "she [Sue Dowd] had filed for divorce. I don't think she was divorced yet either."

had driven the car before September 6, 1969," Molly's answer was no more certain or positive, "Well she had known on one occasion Gordon was in the car with me, *whether she knew he drove it or not I can't remember exactly . . . ."* At another point in her testimony she repeated *"I don't know if I told her Gordon was driving the car."* Mrs. Camp confirmed her knowledge of the fact that Humphrey had been in the automobile with Molly, but in response to inquiries as to whether or not she had known that Humphrey had *driven* the automobile prior to September 6, 1969, she stated, *"I just don't remember . . . I don't believe; I just really can't say . . . . I don't remember the facts on that."*

The multiple *purposes* of the ill-fated trip to Cape Girardeau on September 6, 1969, were stated thusly by Molly: "I didn't have laundry facilities in my apartment [in Cape Girardeau]. I had brought my laundry and a lot of my clothes to do while [in Lilbourn]. I had purchased some new dishes, ironing board, several things. School . . . registration was to be the next week. . . . I wanted to return these things, getting ready to go back and register . . . on Wednesday the next week. . . . I had some other errands to run, some personal ones. I was going to pick up some groceries. . . . I wanted some things and mother had asked me to get some chickens. I bought her two or three."

Before Molly left about 1:30 or 2 P.M., her mother "told her to be careful because the tires weren't too good." In turn, Molly informed her mother that she intended to "go by" the home of her friend, Sue Dowd, in New Madrid and "perhaps get Sue" to accompany her to Cape Girardeau. Molly's account of what happened in New Madrid was: "There had been some tentative talk, my group fussing about going water skiing the next day . . . . I was going by to tell them that I wasn't going to go . . . water skiing, I had to go to Cape." But, when Molly reached Sue's home, Gordon Humphrey and his older brother were there and the four young people went skiing on the Mississippi River at New Madrid for "around two hours." When they returned to Sue's home, Molly asked Sue "if she would go with me" but "Sue said no. . . . She was going hunting, she had already made plans. I [Molly] said, 'Well, I hate to go by myself.' Gordon [Humphrey] said, 'Well, I will go with you, but I will have to have time to change' because we were all in our bathing suits . . . ." After waiting "a certain amount of time" suggested by Humphrey, Molly drove to his home. By then it was, so Humphrey said, "late afternoon" although "still light." When he "came out of the house [Molly] was sitting on the right passenger side of the car," and at her request he drove thereafter to the time of accident. The only time Humphrey had spoken to Molly's mother was about "a month before the accident" when he, as one of a group of young people who had "played cards" in her home, had been introduced to her. He was driving his automobile on that occasion, and he had no conversation with her then or at any other time concerning her automobile or his operation of it. As he explained, "I never anticipated driving the car."

It is ordinarily "about an hour's drive . . . . maybe fifty miles" from New Madrid to Cape Girardeau, but more time was required for the trip under discussion because en route "the tread came off . . . the right front tire." Humphrey pulled off the highway at Benton and, finding the service station attendants busy, "changed the tire" himself. After arrival in Cape Girardeau, all of the multiple purposes of the trip as hereinbefore outlined in Molly's words were accomplished, which required "a couple of hours" so Humphrey estimated. While in Cape Girardeau, the young people also "had something to eat" and Molly made a telephone call from her apartment to her mother, the purpose and substance of that conversation being thus recounted by Molly: "I called

her because it was raining in Cape. I was afraid it was raining at home and she would be worried about the tire . . . . I was just afraid she would be worried. She had told me to try not to be late. I had gone skiing and she didn't know it. I figured she would probably wonder what was taking so long. Q. Did you tell her Gordon changed the tire? Did you tell her anything about the tire? A. I don't remember if I mentioned that or not. I just told her that I would be home in an hour and a half or two hours. *Q. Do you remember . . . mentioning that you were with somebody? A. I don't think that I did, no. I probably didn't."* It was "dark" when Humphrey and Molly left Cape Girardeau and about 9 to 9:30 P.M. (so Molly thought) when her mother's automobile operated by Humphrey was involved in the tragic crash near New Madrid.

◼ At this point we return to the language of the omnibus clause in the *Hartford* policy issued to Mrs. Camp (the Hartford omnibus clause) which is said by Allstate to have afforded coverage for second permittee Humphrey under the following language, to wit, "any other person using such automobile with the permission of the named insured, *provided his actual op-* *eration* or (if he is not operating) his other actual use *thereof is within the scope of such permission"* (an *actual operation* omnibus clause). The terms *"use"* and *"operation"* are not synonymous and in this setting are words of quite different meaning.[2] "For the *'use'* of an automobile by an individual involves its employment for some purpose or object of the user while its *'operation'* by him involves his direction and control of its mechanism as its driver for the purpose of propelling it as a vehicle."[3] Thus, as employed in an omnibus clause "use" is a term of much broader scope and application than "operate" or "drive,"[4] and conversely the latter terms are of narrower and more restricted meaning. Although one who operates an automobile obviously uses it, one can use an automobile without operating it. Indemnity Ins. Co. of North America v. Metropolitan Casualty Ins. Co. of New York, 33 N.J. 507, 166 A.2d 355, 358; Orrill v. Garrett, 100 Ill.App.2d 194, 241 N.E.2d 1, 3(2); Visintin v. Country Mutual Ins. Co., 78 Ill.App.2d 75, 222 N.E. 2d 550, 553.

The omnibus clause in some earlier policies extended coverage upon the *use,* rather than the *actual use,* of the automobile by the named insured or with his permission.[5] However, it appears that for

---

2. Maryland Casualty Co. v. Marshbank, C.A. 3, 226 F.2d 637, 639(1); State Farm Mutual Auto. Ins. Co. v. Allstate Ins. Co., W.Va., 175 S.E.2d 478, 480(3); Gronquist v. Transit Casualty Co., 105 N.J.Super. 363, 252 A.2d 232, 235; Rose v. Gisi, 139 Neb. 593, 298 N.W. 333, 335.

3. Maryland Casualty Co. v. Marshbank, supra note 2, 226 F.2d at 639; State Farm Mutual Auto. Ins. Co. v. Allstate Ins. Co., supra note 2, 175 S.E.2d at 480–481; Gronquist v. Transit Casualty Co., supra note 2, 252 A.2d at 235; Metcalf v. Hartford Accident & Indemnity Co., 176 Neb. 468, 126 N.W.2d 471, 474. See Indemnity Ins. Co. of North America v. Metropolitan Casualty Ins. Co. of New York, 33 N.J. 507, 166 A.2d 355, 358; Visintin v. Country Mutual Ins. Co., 78 Ill.App.2d 75, 222 N.E.2d 550, 553; Commercial Ins. Co. of Newark, N. J. v. Rogers, Tex.Civ.App., 418 S.W.2d 584,

586; Feitelberg v. Matuson, 124 Misc. 595, 208 N.Y.S. 786, 789.

4. Orrill v. Garrett, 100 Ill.App.2d 194, 241 N.E.2d 1, 3(2); Indemnity Ins. Co. of North America v. Metropolitan Casualty Ins. Co. of New York, supra note 3, 166 A.2d at 358; Woodrich Const. Co. v. Indemnity Ins. Co. of North America, 252 Minn. 86, 89 N.W.2d 412, 418; Protective Fire & Casualty Co. v. Cornelius, 176 Neb. 75, 125 N.W.2d 179, 184–185(16); Oregon Mutual Ins. Co. v. Hollopeter, 251 Or. 619, 447 P.2d 391, 393; Southern California Petroleum Corp. v. Royal Indemnity Co., 70 N.M. 24, 369 P.2d 407, 410; annotation 4 A.L.R.3d 10, 17, 29.

5. Some courts have thought that any attempt "to place different meanings on the two terms ["use" and "actual use"] creates a distinction without a difference . . . ." Metcalf v. Hartford Accident

many years the then "standard" omnibus clause extended coverage to "any person while using the automobile . . . provided the *actual use* of the automobile is by the named insured or with his permission" (an *actual use* omnibus clause). Risjord-Austin, Automobile Liability Insurance Cases—Standard Provisions and Appendix, "Text of 1947 Standard Provisions," pp. 1, 4.[6] An omnibus clause in the hereinbefore-quoted language of the Hartford omnibus clause under consideration here, i. e., "any other person using such automobile with the permission of the named insured, *provided his actual operation* or (if he is not operating) his other actual use *thereof is within the scope of such permission*" (an *actual operation* omnibus clause), first appeared as a "standard" clause in the "Text of January 1, 1963 Revised Standard Provisions" [Risjord-Austin, op. cit. supra, pp. 181, 184], and thereafter was carried forward in the "Text of 1966 Standard Provisions." Risjord-Austin, op. cit. supra, pp. 257, 266.[7]

In the case before us, the precise question becomes whether or not Mrs. Camp fairly and reasonably may be said to have granted implied permission for Humphrey's *operation* of her automobile, i. e., for "his direction and control of its mechanism as its driver" [see again authorities cited marginally in note 3], as distinguished from the express permission admittedly granted by her to Molly for the *use* of that automobile to make a round trip to Cape Girardeau. In sifting and pondering over the evidence for the proper answer to that determinative inquiry, we have been guided by certain relevant and well-established principles, namely, that one relying upon implied permission must prove it; [8] that no implied permission arises merely because someone either uses or operates a motor vehicle without the knowledge of the named insured; [9] that

& Indemnity Co., supra note 3, 126 N.W. 2d at 474(1). Accord: Gronquist v. Transit Casualty Co., supra note 2, 252 A.2d at 236. The more logical view supported by the weight of authority would seem to be that the words "actual use" are employed to make it clear that the use made of the vehicle at the time of accident must have been one actually contemplated by the parties at the time of the original bailment. Employers Mutual Casualty Co. v. Poe, Miss., 191 So.2d 541, 545(1) ; Melvin v. American Automobile Ins. Co., 232 Md. 476, 194 A.2d 269, 271 ; Gulla v. Reynolds, 151 Ohio St. 147, 85 N.E.2d 116, 120 ; 45 C.J.S. Insurance § 829, l. c. 902, and cases collated in note 50. But since neither "use" nor "actual use" is synonymous with, or has the limited and restricted meaning of, "operate" or "actual operation," the distinction or difference in meaning, if any, between "use" and "actual use" is of no importance here.

6. Similar omnibus clauses employing "using" and "actual use" with no reference to "actual operation" were included in the "Text of 1955 Standard Provisions" [Risjord-Austin, Automobile Liability Insurance Cases—Standard Provisions and Appendix, pp. 14, 19], in the "Text of 1956 Standard Provisions" [Risjord-Austin, op. cit. supra, pp. 33, 36], in the "Text of 1958

Standard Provisions" [Risjord-Austin, op. cit. supra, pp. 54, 57], and in the "Text of 1959 Standard Provisions." Risjord-Austin, op. cit. supra, pp. 82, 86. This was the type of omnibus clause in the *Hartford* policy covering a motor vehicle involved in the *1961* accident which gave rise to the second permittee case of Metcalf v. Hartford Accident & Indemnity Co., supra note 3, 126 N.W.2d at 473.

7. Of course, some insurance carriers do not utilize all so-called "standard" clauses or adopt all changes therein. For example, the omnibus clause in *Allstate's policy* issued to Humphrey's parents and received as an exhibit in the case at bar afforded coverage to "[a]ny other person with respect to the owned automobile, provided the *actual use* thereof is with the permission of the named insured."

8. Bourne v. Manley, Mo.App., 435 S.W.2d 420, 427(6) ; Helmkamp v. American Family Mut. Ins. Co., Mo.App., 407 S.W. 2d 559, 570(17) ; Straughan v. Asher, Mo.App., 372 S.W.2d 489, 493(2) ; Rakestraw v. Allstate Ins. Co., 238 S.C. 217, 119 S.E.2d 746, 749(5) ; State Farm Mut. Auto. Ins. Co. v. American Cas. Co., 150 W.Va. 435, 146 S.E.2d 842, 850(5).

9. Varble v. Stanley, Mo.App., 306 S.W.2d 662, 666(5) ; Nye v. James, Mo.App., 373

the permission contemplated by an omnibus clause is something more than mere sufferance or tolerance without taking steps to prevent, that term being used rather in the sense of leave, license or authority with the power to prevent;[10] and that such permission, whether express or implied, must originate in the language or conduct of the named insured or someone having authority to bind him (or her) in that respect.[11] Furthermore, we have been mindful that, although implied permission is not confined to affirmative action,[12] it usually arises from a course of conduct of the parties over a period of time prior to the use in question;[13] and that a course of conduct from which implied permission properly may be found is one "pursued, with knowledge of the facts, for such time and in such manner as to signify, and be compatible only with, an understanding consent amounting to a grant of the privilege involved."[14] But in our deliberation, we have put aside all *post-accident* expressions by Mrs. Camp concerning what she might have been willing to have done or what might have been "agreeable" to her prior to the accident, because determination of the critical issue as to implied permission vel non depends upon what actually was said and done *prior* to the accident, and coverage under the Hartford policy contract may not be created or expanded by unilateral post-accident utterances.[15]

In the case at bar, Mrs. Camp's only personal contact with Humphrey prior to the accident had been when she met him as one of a group of young people playing cards at her home. She had been told that on one occasion he "was in the car" with Molly, but there was no substantial evidence that Mrs. Camp had known he had driven her automobile and no reason for her to have anticipated he would drive it on the September 6th trip to Cape Girardeau or even that he would accompany Molly on the trip. For Molly's portrayal to her mother had been that she (Molly) would "go by" the home of Sue Dowd and "perhaps get Sue" to accompany her, and both Molly and Humphrey insisted that his presence on the trip was nothing more than a happenstance.

We have not overlooked the circumstances (a) that, in granting express

S.W.2d 655, 660(8) ; Hanover Ins. Co. v. Abchal, Mo.App., 375 S.W.2d 605, 608 (2) ; Hartford Acc. & Indem. Co. v. List, Mo.App., 424 S.W.2d 761, 767.

10. Haynes v. Linder, Mo.App., 323 S.W.2d 505, 510(8) ; M.F.A. Mutual Ins. Co. v. Alexander, Mo.App., 361 S.W.2d 171, 179, 180; Nye v. James, supra note 9, 373 S.W.2d at 660(8) ; Helmkamp v. American Family Mut. Ins. Co., supra note 8, 407 S.W.2d at 570.

11. Hartford Acc. & Indem. Co. v. List, supra note 9, 424 S.W.2d at 767; Helmkamp v. American Family Mut. Ins. Co., supra note 8, 407 S.W.2d at 570(17) ; Hanover Ins. Co. v. Abchal, supra note 9, 375 S.W.2d at 609; Hooper v. Maryland Casualty Co., 233 N.C. 154, 63 S.E.2d 128, 131(1).

12. Bourne v. Manley, supra note 8, 435 S.W.2d at 427(7) ; State Farm Mut. Auto. Ins. Co. v. Cook, 186 Va. 658, 43 S.E.2d 863, 867(5), 5 A.L.R.2d 594, 599 (4) ; Globe Indem. Co. v. French, Tex. Civ.App., 382 S.W.2d 771, 774, error ref. n. r. e.

13. Mazdra v. Selective Ins. Co., Mo., 398 S.W.2d 841, 844; Bourne v. Manley, supra note 8, 435 S.W.2d at 427(7) ; Hanover Ins. Co. v. Abchal, supra note 9, 375 S.W.2d at 609(4) ; Alabama Farm Bureau Mut. Cas. Ins. Co. v. Robinson, 269 Ala. 346, 113 So.2d 140, 146(2).

14. Tomasetti v. Maryland Casualty Co., 117 Conn. 505, 169 A. 54, 55; Hinton v. Indemnity Ins. Co. of North America, 175 Va. 205, 8 S.E.2d 279, 283(7) ; Nationwide Mutual Ins. Co. v. Simms, D.C.Md., 231 F.Supp. 787, 796; annotation 5 A.L.R.2d 600, 611. See United Services Auto. Ass'n v. Preferred Accident Ins. Co. of New York, 10 Cir., 190 F.2d 404, 406.

15. Bourne v. Manley, supra note 8, 435 S.W.2d at 426(4) ; Helmkamp v. American Family Mutual Ins. Co., supra note 8, 407 S.W.2d at 571–572(21) ; Hanover Ins. Co. v. Abchal, supra note 9, 375 S.W.2d at 609–610(6, 7) ; Bekaert v. State Farm Mut. Auto. Ins. Co., 8 Cir., 230 F.2d 127, 130–131(4) ; C. H. Elle Construction Co. v. Western Casualty & Surety Co., 9 Cir., 294 F.2d 459, 462–464 (3).

permission for Molly's use of the Oldsmobile on the trip of September 6, 1969, Mrs. Camp did not specifically instruct Molly no other person should be permitted to operate the automobile and (b) that there was no evidence of "any expressed restrictions" on Molly's use of the automobile on previous occasions. But on the other hand, considering the testimony of Mrs. Camp as an integrated whole and the testimony of Molly likewise, as we are required to do where the testimony of each, though not altogether consistent, was not inherently self-contradictory [Superior Loan Corp. of Buffalo v. Robie, Mo.App., 476 S.W.2d 144, 148(2), and cases collated in note 9], it may not fairly and reasonably be inferred and found either (a) that Molly had permission, unrestricted in scope and range, to use her mother's automobile at any and all times [cf. St. Paul Ins. Co. v. Carlyle, Mo. App., 428 S.W.2d 753, 756] or to delegate the right of *actual operation* to another when she did use it, or (b) that Mrs. Camp had any knowledge, actual or constructive, that Molly had entrusted actual operation of the Oldsmobile to any other person prior to the trip of September 6, 1969, or (c) that Mrs. Camp had any reason even to suspect that Molly would, for the first time, entrust actual operation of the Oldsmobile to another on that trip. Certainly, the mere grant of permission to Molly to *use* the Oldsmobile did not, in and of itself, authorize her to delegate *actual operation* thereof to Humphrey so as to bring him within the coverage of Hartford's omnibus clause. Annotation 4 A.L.R.3d 10, 25, and cases from twenty-one jurisdictions collected in note 18. On the transcript presented to us, we are moved to the factual determination that neither the prior course of conduct of the parties nor the express permission granted by Mrs. Camp for Molly's use of her automobile on the September 6, 1969, trip to Cape Girardeau extended implied permission for Humphrey's actual operation of the automobile on that trip.

In their brief, Allstate's counsel insist that implied permission should be found in the instant case "on the basis of the mentioned criteria" in our case of St. Paul Ins. Co. v. Carlyle, Mo.App., 428 S.W.2d 753. Before closing this discussion, we would point out (1) that, although the St. Paul policy contained an *actual operation* omnibus clause framed in somewhat similar language to that under consideration here (albeit with certain significant differences, as we find upon present reexamination of the *entire* omnibus clause in that policy), the distinction between *actual use* and *actual operation* omnibus clauses was neither noted nor discussed in *St. Paul,* and (2) that in *St. Paul* we did not designate or list "criteria" for determination of coverage in a second permittee case under any type of omnibus clause but simply found that, on the basis of the factual issues or contentions there presented, those seeking coverage were not entitled to it. Furthermore, we have hereinbefore resolved adversely to Allstate two of the four like factual issues or contentions (mischaracterized here by Allstate's counsel as "criteria") considered in *St. Paul,* by our factual determination that it may *not* be fairly and reasonably found (a) that Molly had permission, unrestricted in scope and range, to use her mother's automobile or (b) that, by the prior course of conduct of the parties, Mrs. Camp had knowingly acquiesced in the use of her automobile by third persons.

The judgment and decree of the circuit court is set aside and the cause is remanded with directions to enter a judgment and decree not inconsistent with the views herein expressed, including (but not necessarily limited to) a specific declaration that Allstate is the primary insurer of Gordon Humphrey with respect to claims and litigation resulting or to result from the accident near New Madrid on September 6, 1969, in which the Oldsmobile automobile owned by Mrs. Myrtle Camp was involved.

TITUS, C. J., and HOGAN, J., concur.