## STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Plaintiff,

v.

## Kendall R. SCHEEL, et al., Defendants– Respondents,

and

## American Standard Insurance Company, Third–Party Defendant–Appellant.

### Nos. WD 54581, WD 54614.

Missouri Court of Appeals, Western District.

Aug. 18, 1998.

Cynthia Barchet, Columbia, for Appellant.

William D. Mize, Kansas City, for Plaintiff.

Kendall R., Robert W. Scheel, Excello, Respondents acting pro se.

John David Collins, Macon, for Respondents Chew and Hendricks.

Before HANNA, P.J., and LAURA DENVIR STITH and EDWIN H. SMITH, JJ.

EDWIN H. SMITH, Judge.

American Standard Insurance Company appeals from the circuit court's judgment entered in favor of the defendants below: Kendall R. Scheel (Kendall); Robert W. Scheel (Kendall's father); and respondents, Danny R. Chew and Holly Hendricks, declaring, *inter alia*, that a policy of insurance, number 0338-0891-02-78-SPPA-MO, issued by it to Kendall on his 1983 Chevrolet Camaro provided non-owned vehicle coverage for an accident involving his operation of his parents' 1989 Ford Ranger.

In its sole point on appeal, the appellant claims that the trial court erred in declaring that the policy it issued to Kendall on his Camaro provided liability coverage for the accident involving his operation of his parents' Ford Ranger on August 29, 1994, because the policy specifically excluded liability coverage for operation of a "non-owned vehicle," such as his parents' Ford Ranger, without the permission of the owners in that the record did not support a finding that the exclusion violated the Motor Vehicle Financial Responsibility Law (MVFRL),

§§ 303.010,[1] *et seq.*, or that on the day the accident occurred, Kendall had the implied permission of his parents to operate their Ford Ranger.

We reverse and remand.

### Facts

On April 19, 1991, Kendall and his father purchased the Ford Ranger. On July 28, 1991, Kendall's operator's license was suspended due to an accumulation of points. It was again suspended on December 18, 1992, as a result of being cited for driving while intoxicated. Because he could not afford the loan and insurance payments, Kendall gave up physical possession of the Ford Ranger to his father and his mother (Sandra J. Scheel) in December of 1991 or January of 1992. He divested himself of legal title to the Ford Ranger on February 1, 1993, when title was transferred from him and his father to his parents. At that time, he acquired from his parents a 1986 F150 Ford truck. Having transferred the Ford Ranger to his parents, Kendall did not possess a set of keys to it; however, he did have access to a set, which hung on a key board in the kitchen of his parents' house.

A policy of liability insurance was issued by State Farm Insurance Company (State Farm) to Kendall's father on the Ford Ranger. The policy specifically excluded coverage for bodily injury, loss, or damage while the Ford Ranger was being operated by Kendall. Kendall's father admitted that he signed the exclusion, but his mother testified she did not, and, as far as she knew, it was okay for Kendall to drive the Ford Ranger whenever he wanted. In the fall of 1992, Kendall acquired the Camaro, for which the appellant issued to him a liability insurance policy, number 0338–0891–02–78–SPPA–MO (the American Standard policy), which was in full force and effect on August 29, 1994. This policy provided liability coverage for a non-owned vehicle provided it was being operated with the owner's consent or permission.

Although he was excluded from coverage under the State Farm policy, a fact which was communicated to Kendall by his father,

Kendall operated the Ford Ranger on six to eight occasions, after transferring title to his parents, at the specific request of and with the express consent and permission of his father for the purpose of taking his parents' boat to and from the boat ramp. The ramp was located, at most, one mile from their house on a gravel road. Kendall testified that he may have asked his father to use the Ford Ranger on other occasions, but permission was denied.

In August of 1994, the transmission in Kendall's Camaro "went out." As a result, he struck a bargain with the Fayette Auto Salvage Yard to put in a salvaged transmission. As part of the bargain, Kendall was to deliver to the salvage yard the transmission that went out in his Camaro. Because he did not own a vehicle capable of transporting the transmission, on August 29, 1994, he took his parents' Ford Ranger and operated it for that purpose from his home in Excello to the salvage yard in Fayette. He did not obtain express permission from his parents to operate the Ford Ranger on this occasion. They were out of town at the time.

While returning from Fayette, having dropped off the transmission at the salvage yard, Kendall became involved in a motor vehicle accident. He collided with a vehicle driven by respondent Danny Chew and owned by respondent Holly Hendricks.

In December of 1994, State Farm filed a declaratory judgment action in the Circuit Court of Macon County against Kendall, his father, and the respondents, requesting a declaration that there was no coverage for the accident under the State Farm policy. The appellant was subsequently added as a third-party defendant. On May 12, 1997, the case was tried before the Honorable Ronald M. Belt. On June 13, 1997, the trial court entered its judgment declaring that both the American Standard and State Farm policies provided coverage for the accident involving Kendall's operation of his parents' Ford Ranger. As to coverage pursuant to the American Standard policy, the trial court found coverage under the policy's non-owned vehicle coverage provision, based on its find-

---

1. All statutory references are to RSMo 1994, unless otherwise indicated.

ing that, at the time of the accident, Kendall had the implied permission of his parents to operate their Ford Ranger.

Both the appellant and State Farm appealed the declaratory judgment of the circuit court. However, State Farm dismissed its appeal on October 14, 1997.

## Standard of Review

Under the standard of review in declaratory judgment cases, we will affirm the decision of the trial court "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law."

*McDermott v. Carnahan*, 934 S.W.2d 285, 287 (Mo. banc 1996) (quoting *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)). In determining the sufficiency of the evidence, this court accepts as true the evidence and inferences from it favorable to the trial court's judgment and disregards contrary evidence. *Automobile Club Inter–Ins. Exch. v. Chamberlain*, 839 S.W.2d 378, 381 (Mo.App. 1992). "Substantial evidence is that which a reasonable mind would accept as sufficient to support a particular conclusion, granting all reasonable inferences which can be drawn from it...." *Id.* at 382 (quoting *Farmers and Merchants Ins. Co. v. Harris*, 814 S.W.2d 332, 334 (Mo.App.1991)).

## I.

The appellant claims that the trial court erred in declaring that the policy it issued to Kendall on his Camaro included liability coverage for the accident involving his operation of his parents' Ford Ranger on August 29, 1994, because the policy specifically excluded liability coverage for his operation of a "non-owned vehicle," such as his parents' Ford Ranger, without the permission of the owners in that the record did not support a finding that the exclusion violated the MVFRL or, that on the day of the accident, Kendall had the implied permission of his parents to operate their Ford Ranger. The respondents contend that the trial court did not err in declaring that there was coverage because the policy language was ambiguous as to whether there was coverage under an "owner's policy" or "operator's policy," as defined in the MVFRL, and as such, it should be construed against the appellant as being an operator's policy, which would require coverage within the required MVFRL limits, regardless of whether Kendall had his parents' permission to operate the Ford Ranger. In the alternative, the respondents contend that, even if the policy did not violate the MVFRL and Kendall's parents' permission was a precursor to a declaration of coverage, the record supports such a finding by the trial court.

Given the claims and arguments of the parties, logically, we must first determine the issue of whether the appellant could, without violating Missouri public policy, as expressed in the MVFRL, contract with Kendall to exclude liability coverage for his operation of a non-owned vehicle where he lacked the owners' consent. If, in fact, we find that such an exclusion does violate the MVFRL, then we will affirm the declaratory judgment of the trial court because the appellant would not be permitted to exclude coverage of Kendall's operation of his parents' Ford Ranger based on their lack of permission to do so. However, if we find that such an exclusion is permitted under the MVFRL, we will then address the issue of whether the evidence presented, *sub judice*, was sufficient to support a finding by the trial court that Kendall had his parents' permission to use their Ford Ranger on the day of the accident, a prerequisite to a finding of coverage under the policy.

### A. Validity of Exclusion from Coverage Under MVFRL

The MVFRL was enacted in 1986 and can be found in § 303.010, *et seq. Halpin v. American Family Mut. Ins. Co.*, 823 S.W.2d 479, 480 (Mo. banc 1992). Section 303.025 states:

1. No owner of a motor vehicle registered in this state shall operate the vehicle ... unless the owner maintains the financial responsibility as required in this section. Furthermore, no person shall operate a motor vehicle owned by another with the knowledge that the owner has not main-

tained financial responsibility unless such person has financial responsibility which covers his operation of the other's vehicle.

2. A motor vehicle owner shall maintain his financial responsibility in a manner provided for in section 303.160, or with a motor vehicle liability policy which conforms to the requirements of the laws of this state.

This section establishes

a mandate for maintenance of financial responsibility by owners of motor vehicles and, absent owner's coverage, requires operators to maintain financial responsibility when operating a vehicle owned by another. However, Section 303.025 does not define the nature or extent of the financial responsibility required. To determine what will satisfy the mandate, one must look to Section 303.160, *et seq.*, RSMo 1994.

*First Nat'l Ins. Co. of Am. v. Clark*, 899 S.W.2d 520, 522 (Mo. banc 1995). To comply with the mandate of § 303.025, most owners and operators of vehicles purchase a motor vehicle liability policy. *Id.* "A 'motor vehicle liability policy' as the term is used in [Chapter 303] shall mean an owner's or an operator's policy of liability insurance...." § 303.190.1.

"[P]ublic policy requires that a contract of liability insurance provide the coverage indicated in *§ 303.190* so that the insured will be in compliance with *§ 303.025*." *Halpin*, 823 S.W.2d at 481. "*Section 303.190* specifies the minimum coverage that will comply with *§ 303.025*, as being insurance against 'loss from the liability imposed by law....' " *Id.* In this respect, § 303.190 provides the following as to an owner's or operator's policy:

2. Such *owner's policy* of liability insurance:

(1) Shall designate by explicit description or by appropriate reference all motor vehicles with respect to which coverage is thereby to be granted; and

(2) Shall insure the person named therein and any other person, as insured, using any such motor vehicle or motor vehicles with the express or implied permission of such named insured, against loss from the liability imposed by law for damages arising out of the ownership, maintenance or use of such motor vehicle or motor vehicles within the United States of America or the Dominion of Canada, subject to limits, exclusive of interest and costs, with respect to each such motor vehicle, as follows: twenty-five thousand dollars because of bodily injury to or death of one person in any one accident and, subject to said limit for one person, fifty thousand dollars because of bodily injury to or death of two or more persons in any one accident, and ten thousand dollars because of injury to or destruction of property of others in any one accident.

3. Such *operator's policy* of liability insurance shall insure the person named' as insured therein against loss from the liability imposed upon him by law for damages arising out of the use by him of any motor vehicle not owned by him, within the said territorial limits and subject to the same limits of liability as are set forth above with respect to any owner's policy of liability insurance.

(Emphasis added.)

The appellant contends that, given the coverage provided, the policy issued to Kendall was an owner's policy which satisfied the requirements of the MVFRL, specifically subsection 2 of § 303.190. The respondents, on the other hand, contend that the language of the policy was ambiguous as to whether the policy provided coverage as required in an owner's policy, as provided in subsection 2, or coverage as required in an operator's policy, as provided in subsection 3. In fact, the respondents contend that, to avoid any ambiguity as to the coverage being provided Kendall, the appellant should have specifically denominated the policy as being one or the other. The significance of whether the policy issued to Kendall was an owner's or operator's policy can be found in what exclusions were permitted under each without violating the MVFRL as to the required minimum coverages. In this respect, the appellant argues that the policy issued to Kendall was an owner's policy which satisfied the requirements of § 303.190.2, and that as such, the exclusion from coverage of Kendall's operation of a "non-owned vehicle" without the owner's permission did not violate the

MVFRL. The respondents argue that because the policy language is ambiguous as to whether it provided the coverage required by § 303.190.2, as an owner's policy, or § 303.190.3, as an operator's policy, the policy should be construed against the appellant and in favor of the insured, Kendall, *see Lanigan v. Snowden*, 938 S.W.2d 330, 332 (Mo.App.1997) (holding that "[a]n insurance policy is ambiguous if its meaning is obscure or uncertain, and if it is ambiguous, its construction should favor the insured"), as being an operator's policy because, if it is construed as such, the exclusion from coverage of Kendall's operation of a non-owned vehicle without the owner's permission would violate the MVFRL, specifically § 303.190.3, (citing *Shelter Mut. Ins. Co. v. Ridenhour*, 936 S.W.2d 857, 859 (Mo.App.1997)), requiring the exclusion to be ignored and resulting in coverage for Kendall's operation of his parents' Ford Ranger, regardless of whether he had their permission to do so. Simply put, the dispute in this respect is over the exact coverage that was provided for by the contract language, and, depending on the coverage that is found, whether the appellant could exclude coverage for Kendall when he was operating a non-owned vehicle, such as his parents' Ford Ranger, without their permission, without violating the requirements of the MVFRL.

We first look to determine whether, as the respondents contend, the policy language was ambiguous as to the coverage provided. Whether an insurance policy is ambiguous is a question of law. *Gulf Ins. Co. v. Noble Broad.*, 936 S.W.2d 810, 813 (Mo. banc 1997). In construing an insurance policy, "the courts must give the contract's language its plain meaning." *Lanigan*, 938 S.W.2d at 332. "An ambiguity exists when there is duplicity, indistinctness, or uncertainty in the meaning of the language in the policy. Language is ambiguous if it is reasonably open to different constructions." *Gulf Ins. Co.*, 936 S.W.2d at 814. In determining whether the language is ambiguous, it "will be viewed in the meaning that would ordinarily be understood by the layman who bought and paid for the policy." *Zemelman v. Equity Mut. Ins. Co.*, 935 S.W.2d 673, 675 (Mo.App.1996) (citing *Robin v. Blue Cross Hosp. Serv., Inc.*,

637 S.W.2d 695, 698 (Mo. banc 1982)). "Where insurance policies are unambiguous, the rules of construction are inapplicable, and absent a public policy to the contrary, the policy will be enforced as written." *Krombach v. Mayflower Ins. Co.*, 827 S.W.2d 208, 210 (Mo. banc 1992). "Where provisions of an insurance policy are ambiguous, they are construed against the insurer." *Id.*

■ The respondents contend that the policy was ambiguous in that, on one hand, in "Part I—Liability Coverage," it provided motor vehicle liability coverage for an "insured person," which included Kendall or a "relative," when he or she was driving "any car" other than the "insured car," in this case, the insured car was Kendall's, but on the other hand, in the same section, it excluded from the definition of an insured person, as to any car other than the insured car, "[a]ny person using a vehicle without the permission of the person having lawful possession," or any such person who had permission, "but who exceeds the scope of that permission." In other words, the respondents are contending that because the further definition of an "insured person" in the policy worked to restrict or exclude coverage provided by the initial definition of the same term, the policy was ambiguous. They further argue that the policy is ambiguous because it does not expressly state whether it is an owner's or operator's policy under § 303.190.2 and § 303.190.3, respectively. We disagree.

■ Giving the policy language in question its plain meaning, we fail to see how a layman, such as Kendall, could reasonably construe it in any fashion other than as providing liability coverage for non-owned vehicles as to *permissive* users only. We do not find any duplicity, indistinctness, or uncertainty in the meaning of the policy language in question. As such, we fail to find any ambiguity as the respondents initially contend. Further, as to any ambiguity in the appellant's failure to expressly designate the policy as an owner's or operator's policy under § 303.190, although this fact would be significant to a legal analysis of whether the policy in question complied with the MVFRL, we fail to see how it would be significant to

Kendall, or any other layperson, in determining what coverage was being provided in the policy and would not cause the policy to be ambiguous.

■ Having determined that the policy language was not ambiguous as to the coverage provided, we turn to the issue of whether the coverage provided was contrary to the MVFRL as the respondents contend. In this respect, the respondents contend that, given the language of the policy as to the coverage provided, the policy was an "operator's policy," as provided for in § 303.190.3; and, as such, the policy could not exclude coverage for the unauthorized use of a "non-owned" vehicle, such as the Ford Ranger, in that such an exclusion would be against public policy as expressed in the MVFRL, specifically § 303.190.3. In support of this proposition, the respondents cite *Shelter Mutual Insurance Co. v. Ridenhour*, 936 S.W.2d at 859.

In *Ridenhour*, as in the case at bar, the insureds were contending that the policy in question was an operator's policy, as defined in § 303.190.3, and that, as such, in excluding coverage for the unauthorized use of a non-owned vehicle, it violated public policy as to an operator's policy, requiring the trial court to disregard the exclusion. In claiming that the policy was an operator's policy, the insureds were relying on the language in § 303.190.3 that mandated coverage "for damages arising out of the use by [the insured] of any motor vehicle not owned by him." The *Ridenhour* court held that, regardless of the non-owned vehicle coverage, the policy in question was not an operator's policy as contended by the insureds, but was an owner's policy, and that the exclusion in question did not violate the MVFRL requirements for an owner's policy. *Ridenhour*, 936 S.W.2d at 859. In determining that the policy was "not, nor was it intended to be, an operator's policy of liability insurance as defined by the MVFRL," *id.*, the court relied on the fact that it contained two exclusions which were consistent with the requirements for an owner's policy, but inconsistent with those for an operator's policy, one of which was an exclusion for the unauthorized use of a non-owned vehicle. *Id.* In other words,

unlike the insureds, who viewed this as a case of coverage under an operator's policy, governed by § 303.190.3, with an exclusion which was unenforceable as being against public policy, the court viewed it as a case of coverage under an owner's policy, governed by § 303.190.2, which although not required under an owner's policy, provided added or excess coverage for non-owned vehicles. For reasons not apparent in the court's opinion, the insureds did not argue and the court did not consider the possibility that the policy contained both owner's and operator's policy provisions, which would result in a different analysis than was employed by the appellate court in deciding the case.

In *First National Insurance Co. of America v. Clark*, 899 S.W.2d at 523, the Missouri Supreme Court recognized that many motor vehicle insurance policies contain provisions making them *both* an owner's and an operator's policy under § 303.190. In this regard, the Supreme Court held that the

public policy of this state is satisfied when there is an owners [*sic*] policy of liability insurance sufficient to meet the minimum requirements of Missouri's financial responsibility law. § 303.025. It is sufficient to say that because there [is] an owner's policy in effect, no operator's policy of liability insurance on the same vehicle is required by the Missouri financial responsibility law.

*Id.* at 523. Although not cited by the *Clark* court, the Supreme Court had essentially reached this same conclusion in *Halpin v. American Family Mutual Insurance Co.*, 823 S.W.2d at 483, holding that § 303.190.7 "manifests to insureds that they have no basis for expecting coverage in excess of the requirements of *§ 303.190.2*," which governs an owner's policy. Section 303.190.7 reads as follows:

Any policy which grants the coverage required for a motor vehicle liability policy may also grant any lawful coverage in excess of or in addition to the coverage specified for a motor vehicle liability policy and such excess or additional coverage shall not be subject to the provisions of this chapter. With respect to a policy which grants such excess or additional cov-

erage the term "motor vehicle liability policy" shall apply only to that part of the coverage which is required by this section.

■ The upshot of these holdings is that under § 303.190, coverage provided by "either an owner's or an operator's policy satisfies the requirements of the MVFRL," *Sisk v. American Family Mut. Ins. Co.*, 860 S.W.2d 34, 36 (Mo.App.1993), and that where there is coverage which complies with either § 303.190.2, for an owner's policy, or § 303.190.3, for an operator's policy, any added or excess coverage not required under one or the other does not have to comply with the requirements of the MVFRL. Given this fact, in determining whether the policy in question here complied with the MVFRL, we now turn to the issue of whether it was an owner's or operator's policy.

The requirements for an owner's policy are set forth in § 303.190.2. The policy must specifically describe all vehicles covered by the policy. Further, the policy must insure against loss arising out of the use of the described vehicle....

The requirements for an operator's policy are set forth in § 303.190.3. Unlike an owner's policy, an operator's policy does not insure a particular vehicle. Rather, it protects the person 'against loss from the liability imposed upon him by law for damages arising out of the use by him of any motor vehicle not owned by him.' *Id.* . . . .

*Id.* at 36. With these definitions of an owner's and operator's policy to guide us, it is apparent that, as was the case in *Clark*, the policy in dispute here contained provisions making it both an owner's and operator's policy. Thus, if the policy met the requirements of the MVFRL for either an owner's or operator's policy, as found in §§ 303.190.2 and 303.190.3 respectively, the public policy of Missouri was satisfied and the policy should be enforced as written, regardless of

whether the excess coverage was in conformity with the requirements of the MVFRL.

The only assertion the respondents make as to the American Standard policy violating the MVFRL is that, if it is an operator's policy only, the policy exclusion for the unauthorized use of a non-owned vehicle is contrary to § 303.190.3 and unenforceable. They in no way contend that if the policy is an owner's policy that it in any way violated the MVFRL, specifically § 303.190.2. Because we find the policy in question here is both an owner's and operator's policy and there is no challenge to any provision as to its owner's policy coverage as violating the MVFRL, then the fact that the policy's exclusion for the unauthorized use of a non-owned vehicle may violate the MVFRL as to an operator's policy [2] only is inconsequential in determining whether the policy should not be enforced as written as being violative of the MVFRL. *Clark*, 899 S.W.2d at 523; *Halpin*, 823 S.W.2d at 483. For the reasons stated, we hold that the policy exclusion challenged by the respondents does not violate the MVFRL.

Having determined that the policy exclusion in question did not violate the MVFRL, we now turn to the appellant's claim that the evidence was insufficient to support the finding by the trial court that Kendall had his parents' implied permission to use their Ford Ranger on the day of the accident, a prerequisite to its finding of coverage under the policy.

### B. Sufficiency of the Evidence to Support Finding of Permission

■ The requirement of "permissive use" of a motor vehicle in an omnibus or non-owned vehicle clause of an automobile insurance policy to limit liability coverage is a question of fact which may be satisfied by a showing of either express or implied permis-

---

**2.** Although the *Ridenhour* court found an exclusion of coverage for the unauthorized use of a non-owned vehicle to be "inconsistent" with the MVFRL requirements for an operator's policy, it did not expressly hold that such an exclusion would violate public policy if the only coverage provided was through an operator's policy. Our research does not disclose any Missouri cases

that have decided this precise issue. In any event, because the determination of the issue of whether the challenged exclusion in the instant policy violates the MVFRL does not turn on whether it violates the MVFRL requirements for an operator's policy, as found in § 303.190.3, where it is the only coverage provided, we leave the determination of that issue for another day.

sion. *State Farm Fire & Cas. Co. v. Ricks,* 902 S.W.2d 323, 324 (Mo.App.1995) (interpreting an omnibus clause); *Auto–Owners Ins. Co. v. McGaugh,* 617 S.W.2d 436, 441 (Mo.App.1981) (interpreting a non-owned vehicle clause). In this respect, the trial court here specifically found in its judgment, declaring that there was liability coverage under the American Standard policy, that Kendall "was using the 1989 Ford Ranger pickup truck within the scope of the implied consent and permission of [his parents]." Thus, the trial court found permissive-user coverage of a non-owned vehicle under the policy based on the implied permission of Kendall's parents, not express permission. The trial court's finding of implied permission is in keeping with the implied permission theory asserted by the respondents to establish coverage at trial and in their brief. Thus, the issue for us to determine is whether the record supports the trial court's finding that Kendall had the implied permission of his parents to use their Ford Ranger when the accident in question occurred.

"Implied permission is determined from the facts and circumstances of the case and usually arises from a course of conduct over a period of time." *Ricks,* 902 S.W.2d at 324. "The burden of proving coverage is upon the person seeking coverage." *Chamberlain,* 839 S.W.2d at 382. As such,

> one relying upon implied permission must prove it, that no implied permission arises merely because someone obtains possession of a vehicle and uses it without the knowledge of the named insured, and that the permission contemplated by the omnibus clause [of the policy] is something more than mere sufferance or tolerance without taking steps to prevent, that term being used rather in the sense of leave, license or authority with the power to prevent. But implied permission is not confined to affirmative action, and 'is not necessarily limited to that granted by arrangement between the parties or otherwise in definite, express terms.' It may and usually does arise from a course of conduct of the parties over a period of time prior to the use in question.

*Bourne v. Manley,* 435 S.W.2d 420, 427 (Mo.App.1968) (footnotes omitted). Implied permission "may be found to extend to uses of which the insured had no advance notice ... or even in some circumstances to a use theretofore disapproved by the insured." *Id.* at 429.

In reviewing the record, we find the following facts were undisputed: Kendall and his father jointly purchased and owned the Ford Ranger prior to its legal title being transferred to Kendall's parents on February 1, 1993, because he could not afford to make the loan and insurance payments on it. Actual physical possession of the vehicle was transferred to his parents in December of 1991 or January of 1992. As a result of several license suspensions resulting from an accumulation of points and a citation for drinking and driving, he was excluded as a covered driver under his parents' State Farm policy covering the pickup. On approximately six to eight occasions, prior to the accident and after relinquishing ownership of the pickup to his parents, he operated the pickup at the specific request of his father to deliver his parents' boat to the dock which was located approximately one mile from his parents' home on a gravel road. On those occasions, either his father or someone else accompanied Kendall to help dock the boat. He did not operate the pickup on any other occasions. In fact, Kendall testified that any requests to use the vehicle on other occasions were denied by his father. He did not have his own keys to the vehicle, although he did have access to a set which was hanging on a key board in his parents' house. At the time of the accident, both parents were out of the state. Neither parent had given him express permission to drive the pickup on the day of the accident. The mother testified that she, unlike her husband, did not sign any insurance documents to exclude Kendall from coverage on the Ford Ranger, was not aware that he could not operate the pickup, and that, if asked, she would have given him permission to operate the vehicle on the day of the accident.

Accepting as true the evidence and inferences from it favorable to the trial court's judgment and disregarding the contrary evi-

dence, we fail to find substantial evidence to support the trial court's finding that Kendall had the implied permission of his parents to operate their Ford Ranger when the accident occurred. The evidence, in any respect, fails to establish the necessary course of conduct between the parties to establish that Kendall had the implied permission of his parents to use the vehicle. The only times he previously operated the pickup was with the express permission of his father and then only for the limited purpose of docking the boat. All requests to operate the vehicle on other occasions or for other purposes were denied. Kendall admitted that he knew he was not to operate the vehicle without permission. Further, although Kendall's mother testified she was not aware that he was not covered to drive the pickup, Kendall's father specifically contracted with his insurance carrier to exclude Kendall as an insured driver. At best, the evidence would establish that Kendall had possession of the vehicle at the time of the accident and that his father had given him express permission to operate the vehicle on several previous occasions for a limited purpose.

To establish implied permission, the respondents, in their brief, point to the fact that Kendall's mother testified at trial that had she not been out of town, she would have given Kendall express permission to drive the vehicle at the time of the accident. However, our reading of the record indicates that this testimony was objected to by the appellant, which objection was sustained, placing it outside the record and outside our consideration on appeal. They further assert that the evidence indicates that Kendall's "father would probably have given him express permission" to drive the pickup, if asked. Even if there was such evidence in the record, it is totally irrelevant to a determination of whether implied permission was granted. *Hauser v. Hill*, 510 S.W.2d 765, 767 (Mo.App. 1974); *Allstate Ins. Co. v. Hartford Accident & Indem. Co.*, 486 S.W.2d 38, 45 (Mo.App. 1972). "[W]hether implied permission exists is determined by what was actually said and done prior to the accident and is not created nor destroyed by post-accident utterances and opinions." *Hauser*, 510 S.W.2d at 767.

In their brief, the respondents rely primarily on the case of *State Farm Mutual Automobile Insurance Co. v. Foley*, 624 S.W.2d 853 (Mo.App.1981) for their assertion that the evidence here was sufficient to support a finding of implied permission. In *Foley*, the court found, based on the following circumstances, substantial evidence to support a finding that the owner of the vehicle (Mike) had given "tacit" or implied permission for his friend (Randy) to drive his motor vehicle: "Mike and Randy were good friends, Mike had allowed Randy to drive the car several times when Mike was present, Randy had driven the car once alone, Mike left the keys in the car, and Mike made no attempt, according to his testimony, other than to wave to Randy 'to flag him down.'" *Id.* at 857–58. *Foley* is factually distinguishable from the case at bar. There, unlike here, the keys were left in the ignition. Moreover, there, unlike here, the owner was actually present and witnessed his motor vehicle being driven by the non-owner, affording him an opportunity to express, by his actions, whether the non-owner driver had his implied permission to operate the vehicle. In this respect, the record in *Foley* indicated that Mike, while riding on a motorcycle with a friend, passed Randy going in the opposite direction, waved, and kept going. There was a dispute as to whether Mike was waving to Randy to flag him down or to say good-bye. The *Foley* court noted that "the trial court concluded that, when Mike made a waving motion to Randy as Mike and Parker passed the Chevrolet on their motorcycle and then continued riding in the opposite direction from the car, Mike implied his permission for Randy to continue to drive the car." *Id.* at 857. Given these factual differences, we are unpersuaded that *Foley* requires us to find that there is substantial evidence here to support a finding by the trial court that Kendall had implied permission from his parents to operate their Ford Ranger at the time of the accident.

We find the case of *Hartford Accident and Indemnity Co. v. List*, 424 S.W.2d 761 (Mo. App.1968) to be more persuasive than *Foley* as to the issue with which we are confronted. Although *List* involved whether a submissible case had been made for instructing the

jury on implied permission, it still dealt with the issue of what constituted substantial evidence of implied permission. The court there found that there was not substantial evidence in the record to support the submission of implied permission. In making this finding, the court stated:

> [T]here is no showing of 'a course of conduct of both of the parties over a period of time prior to the use in question' involving any use of the automobile by Mrs. Moore with Rushton's *implied* permission. It is indisputably clear from the evidence that she used the vehicle only twice before the collision, and that in both instances the use was with Rushton's *express* consent and at his direction, and primarily involved his own purpose and benefit—the purchase of housecleaning supplies.

*Id.* at 767 (emphasis in original). In finding that substantial evidence was lacking as to implied permission, the court in *List* relied on the fact that the prior usage of the motor vehicle was with the express consent of the owner and primarily involved his own purpose and benefit. Such is the case here. The only times Kendall used the Ford Ranger after ownership was transferred to his parents and before the accident occurred was with his father's express consent and primarily for the father's purpose and benefit.

For the reasons stated, we find the trial court erred in entering its judgment declaring coverage, under the non-owned vehicle provision of the American Standard policy covering Kendall's Camaro for the accident involving his operation of his parents' Ford Ranger based on permissive use, because there was no substantial evidence to support the trial court's finding that he had his parents' implied permission to operate the Ford Ranger at the time the accident in question occurred.

## Conclusion

The circuit court's judgment declaring liability insurance coverage for the accident involving Kendall's operation of his parents' Ford Ranger under the American Standard policy, number 0338–0891–02–78–SPPA–MO, issued on Kendall's Camaro, is reversed and the cause remanded to the court for it to enter its judgment for appellant declaring no coverage.

All concur.